**In re MALDEN MILLS, INC., Weavers-Morgan Corp., Malden Mills Industries, Inc., Debtors.**

**Bankruptcy Nos. 81-1640-L to 81-1642-L.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 22, 1984.

See also 35 B.R. 71.

MEMORANDUM AND ORDER

RE: FINAL ALLOWANCES

THOMAS W. LAWLESS, Chief Judge.
This matter is before the Court on the final fee applications of the various professionals who have rendered services in these cases. After appropriate notice and hearing, I find as follows:

## BACKGROUND

These proceedings commenced on September 11, 1981, by the filing of voluntary petitions under Chapter 11 by three separate but related corporations. Malden Mills, Inc. and Weavers-Morgan Corp. were wholly owned subsidiaries of Malden Mills Industries, Inc. Doing business in several states, the Debtors were engaged in the manufacture and sale of apparel and upholstery textile products. The Schedules and Statement of Affairs filed by the Debtors indicated that the combined value of the Debtors' assets exceeded fifty million dollars and that there were several thousand creditors with total claims in excess of sixty million dollars.

While these Debtors were relatively free of secured debt, the initial problem in these cases was the Debtors' extremely poor cash position. Unable to obtain credit by any other means, the Debtors had to negotiate and enter into factoring arrangements with several lenders whereby the lenders were granted priorities under 11 U.S.C. § 364(c)(2), (3). These negotiations and agreements, as well as all subsequent work in these intertwined proceedings, were made more difficult by the need to reconcile the often adverse positions of the respective creditor bodies of each of these Debtors. The speed and efficiency in which these arrangements were consummated and approved by the Court enhanced the Debtors' ability to withstand the shock waves which emanate from the filing of any major reorganization proceeding.

However, with the winter months historically being the Debtors' least profitable period, it was essential that operating expenses be trimmed to the maximum in order to minimize the early losses in the Chapter 11. In cooperation with the other professionals in the proceedings, particularly the Examiner, David Ferrari, whose incisive reports pinpointed troublesome and

unprofitable sectors of the Debtors' operations, Debtors' counsel utilized to the full extent the range of powers given to a Chapter 11 debtor to streamline the companies' operations. These trimmings were done swiftly and surely with little wasted effort and quickened the Debtors' recovery from the early losses.

Further, complex litigation involving the Debtors' pre-filing activities, which could have ground to a halt any reorganization efforts, proceeded apace without that effect on the proceedings. In a large part due to the above-mentioned efforts, the Debtors' financial situation greatly improved and a successful reorganization became possible. Debtors' counsel, principally Richard L. Levine and the firm of Hill & Barlow, analyzed and determined the precise amount of each preference payment and instituted appropriate proceedings for their recovery. By means of settlement negotiations, the Debtors were able to collect (or were excused from dividend payments of) approximately three and a half million dollars, thus enabling the Debtors to fund their plans of reorganization.

The result obtained from the efforts of these professionals has been an unqualified success. The Debtors' plans of reorganization confirmed by this Court on April 7, 1983, provided, *inter alia,* a dividend to unsecured creditors that could be as much as one hundred percent (100%) of the allowed claim, depending on the particular Debtor and option selected by the creditor. Under the plans, the Debtors were merged into one entity, which has operated very successfully since confirmation. Nearly all proceedings and claims have been resolved and the consideration of final allowances is now appropriate.

### LAW

The factors which this Court must consider in establishing final allowances are well-established in this Circuit and are set forth in the case of *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980). Although these standards evolved in the context of awards of attorneys' fees in civil rights litigation, they have been regularly applied in this Circuit in bankruptcy proceedings. *See, e.g., In re Continental Investment Corporation,* 28 B.R. 972 (D.Mass.1982); *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bankr. 1st Cir.1982); *In re Bolton Hall Nursing Home, et al.,* 40 B.R. 657 (Bankr.D.Mass. 1984). Additionally, one fee applicant has requested a premium for the work performed in these cases. As to that request, the Court will apply the standard that is set forth in *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) and applied in *Bolton Hall Nursing Home, et al., supra.*

I have considered the standards set forth in *Furtado* with regard to each applicant. I have reviewed the services performed by the Debtors' co-counsel in light of the United States Trustee's objection that there was a certain amount of duplication of effort between co-counsel. I am aware that although no objections to the remainder of the fee applications were filed, the Court has an independent duty to examine the reasonableness of all fee requests. Because of the large number of applications to be considered, no useful purpose will be served by articulating in this memorandum a repetitive detailed analysis of the *Furtado* criteria with respect to each application. Instead, the Court will focus upon the major players in these cases and deal with applications for lesser amounts in less detailed fashion.

### CO-COUNSEL TO THE DEBTORS

### HILL & BARLOW

Richard L. Levine and the law firm of Hill & Barlow have served as co-counsel to the Debtors during these proceedings providing services in the fields of bankruptcy law and litigation. Mr. Levine was previously the Director and Counsel, Executive Office for United States Trustees, United States Department of Justice and he is currently a member of the Advisory Committee on Bankruptcy Rules of the Judicial Conference of the United States. His expertise in bankruptcy law was a major fac-

tor in achieving the successful results in these cases.

Hill & Barlow was retained by the Debtors subsequent to the Debtors' Chapter 11 filings replacing counsel who had represented the Debtors pre-petition and during the early days of the Chapter 11 proceedings. Because counsel came into the case after the proceedings had begun, counsel had to work intensively to learn the operations of the Debtors. The Debtors' liabilities, assets, business operations, and facts relevant to litigation, threatened or actual, all had to be assimilated quickly for counsel to perform meaningfully. These tasks were done quickly and surely and served to stabilize the Debtors' Chapter 11 operations.

The tasks performed by Hill & Barlow during these proceedings were typical of those performed by bankruptcy counsel in major reorganization cases. A brief and partial listing of the matters successfully handled by Mr. Levine and Hill & Barlow includes negotiations and litigation with the creditors' committees and parties-in-interest concerning (a) extensions of the Debtors' exclusivity periods for filing plans of reorganization; (b) resistance to threatened appointments of Chapter 11 trustees; (c) negotiations and drafting of feasible, acceptable plans of reorganization; (d) resistance to attempted termination of the Debtors' worker compensation self-insurance status; (e) defense of litigation that sought to impose a constructive trust on a substantial portion of the Debtors' assets; and (f) recovery of preferential payments. The expeditious and successful results achieved from counsel's efforts in these matters assured the success of the Debtors' reorganization proceedings.

A review of time records submitted by Hill & Barlow indicates that attorneys and paralegal assistants at this firm devoted a total of 4,731.6 hours to these cases. The weighted average hourly rate charged by these personnel during the course of these proceedings is approximately $103.60, for a total requested base fee of $490,169.50. Based upon my observation of work per-formed and my review of the detailed time sheets submitted by this applicant, I find the time expended and the lodestar rate charged by the applicant appropriate.

In their sworn application for final allowances and reimbursement of expenses Hill & Barlow requests (1) a twenty percent premium for the time expended on general administrative and legal services in these cases, a premium of $72,212 ($361,059 × 20%), and (2) a ten percent premium on the approximately $3,500,000 of preference recoveries generated by counsel, a requested increase in Hill & Barlow's straight-time charges for this task of $129,110 to approximately $170,000.

■ Based upon my analysis of the services performed, I do not find that the quality of services rendered by Hill & Barlow on administrative and general legal matters in these cases was superior to that one reasonably should expect in light of the hourly rates charged. The work was typical of that done in a reorganization proceeding, it was done efficiently and billed at rates that are fully compensatory to the applicant.

Accordingly, Hill & Barlow's request for an upward adjustment of the fees charged on these tasks is denied. *See Blum v. Stenson,* —— U.S. ——, —— – ——, 104 S.Ct. 1541, 1548–1549, 79 L.Ed.2d 891, 901–902 (1984).

■ With respect to the services performed in recovering preferences, however, I find that the quality of legal services rendered by Hill & Barlow was superior to what one should expect in light of the charged hourly rates and that applicant's services accomplished a result that can be considered "exceptional". *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1984). Counsel's accomplishments in this area were twofold: administering the preference recovery effort in a way calculated to minimize the expense to the estate, and executing the extensive legal research and delicate negotiations so as to compel the preferees to accept settlements, the proceeds of which were used to

fund the Debtors' plans of reorganization. With respect to the former, counsel used paralegals, rather than attorneys, to chart and organize lists of the targets of preference recovery, to collate form letters and pleadings, names and addresses for service and the like. With respect to the latter, counsel coordinated the actual "assault" on the preferences, i.e. individual letters, follow up telephone calls, filing of complaints and responding to the myriad legal defenses which were raised with detailed memoranda on relatively unsettled areas of the law that convinced nearly all preferees to accept settlements favorable to the estates. As a result of Hill & Barlow's efforts, the Debtors actually collected (or were excused from dividend payments of) approximately three and a half-million dollars at a cost to the estates of $129,110. Under these circumstances, I consider a ten percent premium on the amount recovered, or $35,000, to be appropriate.

For these reasons, Mr. Levine and the law firm of Hill & Barlow are awarded a final fee of $525,169.00 of which amount $386,823.00 has been previously paid as interim allowances and $138,346.00 is to be paid. In addition, this applicant is allowed final reimbursement of expenses of $19,-908.62 of which amount $19,908.62 has been previously paid leaving a balance of zero (0) to be paid.

## GOULSTON & STORRS

Richard Langerman and the law firm of Goulston & Storrs served as co-counsel to the Debtors throughout these proceedings. Most of co-counsel's services were performed in the general areas of business, commercial law and taxation and are typical of services that general counsel would perform for corporate clients in the ordinary course of their respective businesses. The principal area of co-counsel's activities were corporate law, financing, real estate, contracts, commercial law, taxation, ERISA and labor relations. Mr. Langerman has performed similar services for the Debtors for many years prior to the Chapter 11 filings and his familiarity with the Debtors'

affairs was helpful in achieving successful reorganizations.

The time records submitted indicate that attorney and paralegal personnel at Goulston & Storrs expended 2,768.11 hours on these cases at a weighted average hourly rate of $156.54, for a total requested fee of $433,310.85. Of that amount, Mr. Langerman has billed 2,056.95 hours at a weighted average hourly rate during the proceedings of $178.23—a requested fee of $366,604.25.

■ Under the circumstances of these cases, I am not convinced that the fee charged by Mr. Langerman is appropriate. Considering the difficulties presented in some of the tasks performed by Mr. Langerman and his billable hourly rate, I find counsel's level of commitment in these cases excessive. While Mr. Langerman's knowledge of these Debtors' affairs was important, some of the tasks performed by Mr. Langerman did not require his particular expertise. Responses to routine correspondence and phone inquiries, review and revision of draft pleadings and legal research are not appropriate tasks for counsel with an average billable hourly rate of nearly $180/hour to perform on a routine basis. Counsel who seeks payment of such a hourly rate must delegate those tasks that does not require their particular expertise to junior, less expensive attorneys.

I am not prepared to find from my observations of the work performed or from the fee application submitted that $178.23/hour is the customary fee in the community for all the services performed by Mr. Langerman. This rate I consider appropriate only for those tasks which require the particularized knowledge and experience of counsel and not for every task that counsel might decide to perform. This is not to say that counsel did not do a fine job in these cases. Rather, counsel can not be paid expert rates for routine services. For these reasons, Mr. Langerman's "lodestar" average hourly rate is hereby reduced from the requested rate to a flat $150 hourly rate for all time expended on these cases.

Accordingly, Attorney Langerman and the law firm of Goulston & Storrs are

awarded a final fee of $375,249 of which amount $346,088.00 has been previously paid as interim allowances and $29,161 is to be paid. Additionally, the $20,014.85 of interim reimbursement of expenses is hereby confirmed as a final award.

## COUNSEL TO THE CREDITORS' COMMITTEES

### BARRON & STADFELD

Attorney Hertz N. Henkoff and the law firm of Barron & Stadfeld served as counsel to the creditors' committee of Malden Mills, Inc. Unusually active and knowledgeable, the creditors' committee was comprised of attorneys and financial officers from some of the country's bigger financial institutions and companies. These creditors, many of whom were unaccustomed to their unsecured status in this case, often differed on the approach that their committee should take on various aspects of the Chapter 11 proceeding. Mr. Henkoff was usually able to reconcile these often divergent opinions into a consensus which he effectively represented to the Debtors and the Court.

The most significant portion of counsel's work in this case involved the negotiation of the terms of the Debtor's plan of reorganization. Although counsel was unsuccessful in obtaining the Court's authorization for the appointment of a Chapter 11 trustee and the committee's motion for substantive consolidation was ultimately not pressed to a decision, these actions gave the creditors leverage in their negotiations with the Debtor. The fact that the negotiated plan of reorganization was ultimately accepted by an overwhelming majority of the unsecured creditor body is perhaps the best measure of counsel's work.

The time records submitted indicate that attorney and paralegal personnel at Barron & Stadfeld expended 1,848.5 hours on this case at a weighted average hourly rate of $139.57 per hour, for a total requested fee of $257,991.25. Of that amount, Mr. Henkoff has billed 864.25 hours at a weighted average hourly rate during the proceedings of $175—a requested fee of $151,243.75.

■ For the same reasons set forth above regarding Mr. Langerman's hourly rate, Mr. Henkoff's lodestar hourly rate is hereby reduced to $150/hour for all time expended on this case. While the Court is not insensitive to the need for senior counsel's participation in plan negotiations, strategy conferences and important telephone conferences, the Court is equally aware of the need for senior counsel's delegation of responsibility for routine correspondence and daily phone calls. These latter services are not payable at expert rates.

Accordingly, this applicant is awarded a final fee of $236,385 of which $204,204 has been paid and $32,181 is to be paid. In addition, $6,955.59 in final reimbursements is awarded to this applicant of which amount $6,955.59 has been paid and zero (0) is to be paid.

### GASTON SNOW & ELY BARTLETT

■ Attorney Alan L. Lefkowitz and the law firm of Gaston Snow & Ely Bartlett served as counsel to the creditors' committee of Weavers-Morgan Corp. Most importantly, counsel was successful in staving off attempts by the creditors of Malden Mills, Inc., to reach the substantial amount of unencumbered assets available to the Weavers-Morgan Corp.'s creditors. As a result, creditors of Weavers-Morgan Corp. fared substantially better than the creditors of the other two Debtors. Because I find that this task and the other services rendered were efficiently performed and a substantial benefit received, Alan Lefkowitz and the law firm of Gaston Snow & Ely Bartlett are awarded a final fee of $40,000 of which $29,308 has been paid and $10,692 is to be paid. In addition, $1,424.74 of interim reimbursements is hereby confirmed as a final award of reimbursements.

## EXAMINER

### DAVID J. FERRARI

■ As noted above in this memorandum, Mr. David J. Ferrari's services as Examiner of Malden Mills, Inc. were of

critical importance because his reports provided the Debtor, the creditors and the Court with a detailed, unbiased analysis of the Debtor's past, current, and projected operations and financial condition. As a neutral intermediary, Mr. Ferrari played an important role in this Debtor's successful reorganization and his services are allowed at the rate and amount requested.

Accordingly, this applicant is awarded a final fee of $103,335 of which $97,262 has been paid and the balance of $6,073 is to be paid. Final reimbursement of expenses are awarded in the amount of $6,907.37 of which $3,082.06 has been paid and $3,825.51 is to be paid.

## ACCOUNTANTS
### RICHARD A. EISNER & COMPANY

■ Richard A. Eisner & Company served as accountant to the creditors' committee of Malden Mills, Inc. This applicant provided the creditors' committee with reviews, audits and analyses of (1) the Debtor's operating projections; (2) intercompany accounts; (3) checking accounts and cancelled checks; (4) financial statements and tax returns; (5) the Debtor's bi-weekly cash flows, monthly profit and loss statements, and aged listing of accounts payable; and (6) the preference accounts. Both the Debtor and the creditors' committee support this applicant's fee request and my review of the work performed indicates that the hourly rates and time expended by this applicant are appropriate. Accordingly, this applicant's interim fee award of $193,258 is hereby confirmed as a final award.

■ With respect to Richard A. Eisner & Company's request for reimbursement of expenses in the amount of $42,318.62, however, the documentation submitted by this applicant is totally inadequate for the Court to determine the reasonableness of, or justification for, expenses of this magnitude. Every applicant for compensation or reimbursement has the burden of providing the Court with a sufficient description of services rendered and the expenses incurred to enable the Court to pass on the requested charges. *See Souza v. Southworth*, 564 F.2d 609 (1st Cir.1977); *Matter of Hamilton Hardware Co.*, 11 B.R. 326 (Bankr.E.D.Mich.1981). While some general descriptions may be sufficient for applications for interim reimbursement which are subject to reconsideration at the conclusion of a case, the one-line entries submitted by this applicant in its application for final allowance of reimbursements fails to provide the Court with information necessary to pass on the requested amounts.

For the foregoing reasons, no final award of reimbursements to this applicant shall be made at this time. Richard A. Eisner & Company shall have twenty (20) days from the date of this decision to submit a supplemental application for final reimbursements which describes in detail by date, hour and description, the expenses incurred, the need for the expenses, and a sworn statement regarding this applicant's billing policy on the distinction it makes between overhead and expenses which are properly chargeable to its clients. Upon receipt of such papers, the Court will determine whether further hearing is necessary or if a decision may be issued on the record.

### ARTHUR YOUNG & COMPANY

On or about March 16, 1982, the Debtors filed an application to authorize the retention of Arthur Young & Company ("Arthur Young") for the limited purposes of reviewing the Debtors' year-end inventory and for the preparation of income tax returns and related matters. The Court entered its order approving the appointment of Arthur Young for such limited purposes on April 7, 1982. Notwithstanding this limited order of retention, Arthur Young performed a substantial amount of services, both before and after April 7, 1982, that were admittedly [1] beyond the scope of their or-

---

1. *Cf. In re Certain Special Counsel to the Boston & Maine Corporation*, 737 F.2d 115 (1st Cir. 1984) (where counsel were hired by railroad trustees pursuant to an order that created a

der of appointment. On October 22, 1982, the Debtors filed a motion to expand the Debtors' authority to employ Arthur Young to perform work beyond the scope of their original limited appointment so as to authorize the performance of accounting work incidental to the Debtors' reorganization proceedings and development of plans of reorganization *nunc pro tunc* to October 22, 1981. No hearing was requested on this application and no action was taken on it.

On February 9, 1983, the Debtors' motion to expand authority to employ Arthur Young came before the Court. This motion was marked up for a hearing in response to the Court's December 22, 1982 Order re: second interim allowances of fees wherein the Court ordered that Arthur Young demonstrate its authority for performing the services for which it requested interim allowances. At the hearing on February 9, 1983, the creditors' committee of Malden Mills, Inc. and the United States Trustee supported the Debtors' motion to expand appointment. The Court granted relief under the motion, except to the extent that the motion requested that an order be entered *nunc pro tunc* approving work which had already been performed by Arthur Young. The Court deferred any action on the request for retrospective appointment until the time of final allowances.

In its verified application for final allowances of fees and reimbursement of expenses, Arthur Young requests the Court allow it fees of $334,353 and reimbursements of $27,031.00. Of these amounts, it is undisputed that $88,069 in fees and $8,321 in expenses were for authorized services and $246,284 in fees and $18,710 in expenses were for unauthorized services. The services and reimbursements for which Arthur Young requests *nunc pro tunc* authority to perform and incur include: (a) consultation with respect to the advantage of LIFO versus FIFO inventory; (b) re-

search and review of the tax implications of the Bankruptcy Tax Act of 1980 in order to aid the Debtors in formulating plans of reorganization that conforms to such Tax Act and is feasible in light of the tax changes; (c) research and determination on the carry back provisions of "job's credits" and tax benefits which may accrue to the Debtors from such carry back; (d) rendering assistance to Malden Mills' personnel on various accounting and reporting matters; (e) attending § 341 hearing on behalf of Debtors; (f) working with Richard A. Eisner & Company, the accountants to the creditors' committee, in the discussion and analysis of current and prior financial statement of the Debtors; and (g) performing the necessary accounting work in developing plans of reorganization, a disclosure statement and other documents related to such plan of reorganization, including preparing and reviewing both five and six year financial forecasts of the Debtors' operations.

At the hearing on the applications for final allowances, all parties supported the Debtors' request for *nunc pro tunc* expansion of the Debtors' authority to employ Arthur Young. The chairman of the creditors' committee of Malden Mills, Inc., and the president of Malden Mills, Inc., both filed affidavits stating that they were aware of the scope of services performed by Arthur Young at the time these services were being rendered. Furthermore, the chairman and attorney for the creditors' committee of Malden Mills, Inc., both stated that the preparation of five and six year financial projections by Arthur Young were done at their behest so as to enable the creditors to evaluate various proposed plans of reorganization.

██ For the reasons set forth below, I find that sufficient cause exists to expand Arthur Young's appointment *nunc pro tunc* to October 22, 1981, to include the additional work detailed in Arthur Young's verified statement of services. *See, e.g., In*

---

"legitimate confusion" as to the scope of the authorized work, counsel should not be denied

payment for services of value to the estate).

*re Triangle Chemicals, Inc.*, 697 F.2d 1280 (5th Cir.1983).

First and foremost, Arthur Young does not come before this Court as a stranger because in this Court's Order of April 1, 1982, appointing Arthur Young for limited purposes, all of the following requirements of former Bankruptcy Rule 215 were met by the Debtors:

 a. an application was filed by the Debtors seeking approval of Arthur Young;

 b. the name of the accountant was revealed;

 c. the reasons for the selection of Arthur Young were set forth;

 d. the necessity of employing Arthur Young was set forth;

 e. Arthur Young's connection with the Debtors and the creditors were specified and explained;

 f. the Court determined that Arthur Young's appointment, at least for the limited purposes stated, was in the best interests of the estates.

Therefore, this Court has passed on the major issues concerning Arthur Young's employment prior to their performing much of the services rendered. The only issue not addressed in April, 1982 was the additional scope of the work that Arthur Young was asked to undertake.

The fact that it is more probable than not that the Court would have approved the employment of Arthur Young for these additional tasks if a timely application had been made provides the second basis for entry of a *nunc pro tunc* order. *See Slolkin v. Nachman*, 472 F.2d 222 (7th Cir. 1973); *In re Hite*, 2 F.Supp. 536 (D.Pa. 1932); *In re King Electric Co.*, 19 B.R. 660 (E.D.Va.1982). Arthur Young was the only accountant representing the Debtors and it was and is apparent to all parties that it was necessary that they prepare financial projections that were required by the creditors' committee and perform the normal auditing functions of an outside accountant.

Finally, the equities favor the retrospective appointment of Arthur Young for these tasks. My analysis of the unauthorized services is that they were an integral and necessary part of the Debtors' formulation of feasible and acceptable plans of reorganization. Furthermore, the performance of these services by Arthur Young was done at the request of the creditors and the Debtors; Arthur Young can not be characterized as a gratuitous volunteer. Finally, no suggestion has been made that the failure to seek court approval was anything other than an oversight by counsel for the Debtors. Arthur Young should not be penalized for counsels' mistake.

■ Having determined retrospective appointment appropriate, it is necessary for the Court to determine the reasonableness of the fees requested and the expenses incurred. Applying the *Furtado* standards to the Arthur Young application, I find the hourly charges claimed by this firm somewhat excessive in view of the nature of the services performed and what I consider to be the customary fee in this community for these services. Nor do I consider appropriate billing secretarial time as professional time in a bankruptcy proceeding, particularly at hourly rates of $24.00. Accordingly, Arthur Young's lodestar fee is reduced appropriately and this applicant is awarded final compensation of $297,550 in fee of which $70,455.00 has been paid and $227,095.00 is to be paid. In addition, Arthur Young requests $27,031.00 in what it characterizes as "out of pocket expenses". I find this applicant's documentation of these requested charges inadequate, particularly such entries as "Travel and Overtime Meals—$2,722". I do not recognize overtime meals for professionals as properly chargeable expenses in a bankruptcy proceeding. Accordingly, Arthur Young is awarded $18,680 in expenses of which $6,656.00 has been paid and $12,024 is to be paid.

## TOUCHE, ROSS & COMPANY

■ On September 18, 1981, predecessor counsel to the Debtors filed an application to employ Touche Ross & Company ("Touche Ross") as management consult-

ants. After hearing on October 9, 1981, at which time various objections were stated to the proposed employment, the hearing on the Touche Ross application was continued generally. On October 29, 1981, present counsel for the Debtors renewed the application to authorize the employment of Touche Ross as management consultants. A hearing was requested and scheduled for November 6, 1981. Prior to that hearing, Casco Bank and Midlantic Commercial Company, two of the Debtors' secured creditors, and the creditors' committee of Malden Mills, Inc., all filed objections to the Debtors' proposed retention of Touche Ross. Among other reasons, the Touche Ross application was opposed because Touche Ross was a named defendant in a suit brought in the state court by Midlantic Commercial Co., wherein it was alleged that the Debtors and Touche Ross engaged in fraudulent activity immediately prior to the Debtors' bankruptcy filings. Additionally, objections were raised to the estimated monthly fees of $90,000 to $110,000 proposed in the Touche Ross application. In light of these and the Court's own objections to the proposed employment of Touche Ross, at the hearing held on November 6, 1981, Debtors' counsel requested the Court to defer any action on the Touche Ross application and. continue the matter generally. The Court granted the Debtors' request. No further hearing has been requested or held on this application.

On May 11, 1983, Touche Ross & Company filed a one page application for fees wherein it requested leave to file a "more complete application." The certificate of service filed with the application indicates service of this application was made on the Debtors and creditors' committees' attorneys and the United States Trustee. On July 26, 1983, Touche Ross filed an Amended Application for Fees and Expenses wherein it requested $117,208 in fees and $24,032 in expenses for services rendered between September 11, 1981 and June 25, 1983. No certificate of service has been filed with respect to this fee application and there is no indication from the record before the Court that any party has re-ceived notice of Touche Ross's amended fee application.

In addition to the complete lack of notice, there is absolutely no basis in either law or equity for the allowance of any fee to Touche Ross in these proceedings. Unlike the Arthur Young situation detailed above, there has been no showing that Touche Ross is a disinterested party, that they performed services that benefited these estates or that this Court would have approved their retention by the Debtors if timely application had been made. On the contrary, a question was raised regarding a possible conflict of interest and the Court specifically refused to approve Touche Ross's employment by the Debtors. If the Court is to maintain control of professional fees in bankruptcy proceedings, back-door attempts such as made by this applicant must be dealt with summarily. Touche Ross's fee application is denied with prejudice. *See* former Bankruptcy Rule 215; 11 U.S.C. § 328; 2 Collier on Bankruptcy Para 327.02 (15th ed. 1981); *In re J.M. Wells, Inc.,* 575 F.2d 329 (1st Cir.1978); *In re Morton Shoe Companies,* 22 B.R. 449 (Bankr.D.Mass.1982).

### SPECIAL COUNSEL

### VANN & BORENSTEIN, P.C.

Vann & Borenstein, special counsel to the Debtors, are awarded a final fee of $8,250 of which $5,768 has been paid leaving $2,482 to be paid, and interim reimbursement of $255.90 is hereby confirmed as a final award.

### SECURED CREDITORS' EXPENSES OF COLLECTION

(1) Skadden, Arps, Slate, Meagher & Flom, counsel for secured creditors, J. Henry Schroder Bank & Trust Company and Providence Alliance Life Insurance Company under Indenture, are awarded a final fee of $13,500 of which $9,217 has been paid leaving $4,283 to be paid and interim reimbursements of $3,583.34 is confirmed as a final award.

(2) Casco Bank & Trust Company, interim awards are confirmed as final and additional reimbursements in the amount of $450 are awarded.

(3) J. Henry Schroder Bank, interim awards are confirmed as final and an additional $750 in fee is awarded.

## LAWRENCE REDEVELOPMENT AUTHORITY

The federal government granted a low interest loan (six percent) through the Lawrence Redevelopment Authority ("Lawrence") to Malden Mills, Inc. in the original principal amount of $4,200,000 shortly before the filing of the Debtor's bankruptcy case. Although it was intended that the loan be secured by a lien on various assets of the Debtor, when the first funds were drawn by Malden Mills, Inc., in September, 1981, in the principal amount of $757,000, the security interest was not perfected and Lawrence was an unsecured creditor on the day of the bankruptcy filing.

As a result of the bankruptcy filing and the failure to obtain secured creditor status, however, the federal government and Lawrence terminated the remainder of the grant. In order to obtain the remainder of the low-interest loan, in its confirmed plan of reorganization, the Debtor placed Lawrence in a special class of unsecured creditors and provided that one hundred percent (100%) of Lawrences's claim would be paid over twenty-five years "without interest and upon such other terms as are in accordance with the terms pursuant to which the amount of the claim as advanced to the Debtor (including, without limitation, a security interest in the Debtor's machinery and equipment in Lawrence, Massachusetts, subject and subordinate . . .); provided however, that the Lawrence Redevelopment Authority commits, by its acceptance of the Plan, to make additional loans and payments to . . . the Debtor in accordance with agreements therefore made . . . prior to the [bankruptcy] filing date . . . ." Lawrence accepted the Plan and thus committed itself to the remainder of the loan.

By virtue of the Debtor's agreement in its plan to pay Lawrence's claim in full and upon such other terms as are in accordance with the note, Jason Rosenberg, Esq., counsel to Lawrence, has filed a fee request for $51,500 in fees and $837 in expenses pursuant to a provision in the note that entitles Lawrence to collect reasonable attorneys fees up to a maximum of ten percent (10%) of the amount owed—$757,000.

 Of course, this Court has a duty to review the reasonableness of the fees requested by parties, independent of any contractual provision in a note, either secured or unsecured. In making this review, I am not convinced that it was necessary for counsel to expend the time that he documents in collecting this note. In my mind, Lawrence was virtually assured of full payment because in lieu thereof, the Debtor would not have received the balance of $3,500,000 of the loan at interest rates substantially below the market rate. I find the time expended unreasonable in view of the potential danger to Lawrence's position. Accordingly, applying the *Furtado* standards to counsel's fee request, Jason Rosenberg and Lawrence are awarded final compensation of $35,000 of which $25,000 has been paid leaving $10,000 as a balance to be paid, and interim reimbursement of $837.00 is confirmed as final.

## EXPENSES INCURRED BY MEMBERS OF THE CREDITORS' COMMITTEE OF MALDEN MILLS, INC.

 Six members of the official unsecured creditors' committee of Malden Mills, Inc., have submitted applications for reimbursement of transportation, meals and lodging expenses incurred in attending various meetings of the committee during the pendency of this bankruptcy proceeding. As noted above, the members of the committee were very active and knowledgeable and their participation in this case contributed to the successful reorganization. No objection has been asserted to the allowance of the creditors' committee's expenses.

It has long been the practice of this Court, under both the Bankruptcy Act and

Code, to allow reimbursement of expenses incurred by individual members of creditors' committees where the expenses were reasonably and necessarily incurred in the course of performing committee duties. The former Bankruptcy Rules specifically authorized the reimbursement of these expenses. *See* former Bankruptcy Rules 11–29(c), 10–215 and 12–28. While some courts have read Code Section 503(b)(3)(D) as precluding reimbursement, *see, e.g., In re Interstate Restaurant Systems, Inc.*, 30 B.R. 32 (Bankr.S.D.Fla.1983), I agree with the well-reasoned opinion of Bankruptcy Judge Glennon in *In re GHR Energy Corp.*, 35 B.R. 539 (Bankr.D.Mass.1983) that the Code is silent on the issue and policy reasons and both the old Rules and new Bankruptcy Rule 2016 authorize the reimbursement of out of pocket expenses incurred by committee members. *See also In re Toy & Sports Warehouse, Inc.*, 38 B.R. 646 (Bankr.S.D.N.Y.1984).

Accordingly, having reviewed the documentation submitted by each committee member in support of their applications, the Court confirms as final the interim reimbursements previously received and in addition awards the following reasonable reimbursement of expenses:

| Committee Member | Reimbursement Award |
| --- | --- |
| E. I. duPont de Nemours & Co. | $2,900.00 |
| Arlington Trust Company | 481.06 |
| Casco Bank & Trust Company | 1,200.00 |
| Bank of New England, N.A. | 1,650.00 |
| Mobay Chemical Corporation | 2,200.00 |
| Ti Caro, Inc. | 5,500.00 |

It is so Ordered.

### ORDER

In accordance with the foregoing Memorandum,[1] it is hereby

(1) ORDERED: That all prior awards of interim fees and reimbursements previously awarded in these cases be and hereby are confirmed as final awards; and it is further

1. Copies of the Court's Memorandum and Order re: Final Allowances may be obtained at the

(2) ORDERED: That, in addition to the interim awards confirmed as final above, the following amounts are awarded to the following applicants:

| NAME OF APPLICANT | AMOUNTS TO BE AWARDED |
| --- | --- |
| Richard L. Levine, Esq. and the law firm of Hill & Barlow, Co-Counsel to the Debtors | $138,346.00 (f)<br>-0- (d) |
| Richard Langerman, Esq. and the law firm of Goulston & Storrs, Co-Counsel to the Debtors | 29,161.00 (f)<br>-0- (d) |
| Hertz N. Henkoff, Esq. and the law firm of Barron & Stadfeld, Counsel to the Creditors' Committee of Malden Mills, Inc. | 32,181.00 (f)<br>-0- (d) |
| Alan L. Lefkowitz, Esq. and the law firm of Gaston Snow & Ely Bartlett, Counsel to the Creditors' Committee of Weavers-Morgan Corp. | 10,692.00 (f)<br>-0- (d) |
| David J. Ferrari, Examiner | 6,073.00 (f)<br>3,825.51 (d) |
| Richard A. Eisner & Company, Accountant to the Creditors' Committee of Malden Mills, Inc. | Expenses to be Determined |
| Arthur Young & Company, Accountants | 227,095.00 (f)<br>12,024.00 (d) |
| Touche Ross & Company, Accountants | -0- (f)<br>-0- (d) |
| Vann & Borenstein Special Counsel to the Debtors | 2,482.00 (f)<br>-0- (d) |
| Skadden, Arps, Slate, Meagher & Flom, Counsel for Secured Creditors, J. Henry Schroder Bank & Trust Company and Providence Alliance Life Insurance Company | 4,283.00 (f)<br>-0- (d) |
| Casco Bank & Trust Company, Secured Creditor | -0- (f)<br>450.00 (d) |
| J. Henry Schroder Bank & Trust Company, Secured Creditor | 750.00 (f)<br>-0- (d) |
| Jason Rosenberg, Esq., Counsel to Lawrence Redevelopment Authority | 10,000.00 (f)<br>-0- (d) |
| E. I. duPont de Nemours & Co., c/o Mr. Albert R. Marshall Wilmington, Delaware 19898 Committee Member | -0- (f)<br>2,900.00 (d) |
| Arlington Trust Company c/o Daniel Carragher, Esq. Widett, Slater & Goldman 60 State Street Boston, MA 02109 Committee Member | -0- (f)<br>481.06 (d) |

Clerk's office, Room 212, J.W. McCormack, Post Office and Courthouse, Boston, MA 02109.

| NAME OF APPLICANT | AMOUNTS TO BE AWARDED |
| --- | --- |
| Casco Bank & Trust Company c/o Mr. Denison Gallaudet One Monument Square Portland, ME 04104 Committee Member | $ -0- (f) 1,200.00 (d) |
| Bank of New England, N.A. c/o Robert Gargill, Esq. Choate, Hall & Stewart 60 State Street Boston, MA 02109 Committee Member | -0- (f) 1,650.00 (d) |
| Mobay Chemical Corporation c/o Mr. S. Donald Campbell Penn Lincoln Parkway West Pittsburgh, PA 15205 Committee Member | -0- (f) 2,200.00 (d) |
| Ti Caro, Inc. c/o Robert Somma, Esq. Goldstein & Manello One Federal Street Boston, MA 02110 Committee Member | -0- (f) 5,500.00 (d) |

(f) = fees
(d) = disbursements